UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  1/30/19
```

IGNACIO GRANDA,

                                   Plaintiff,

              -v-

JUAN MANUEL TRUJILLO, SAILBRIDGE CAPITAL,
LLC, and JOHN DOE CORPORATIONS NOS. 1–10,

                                   Defendants.

18 Civ. 3949 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Ignacio Granda brings this action against defendants Juan Manuel Trujillo;
Sailbridge Capital, LLC ("Sailbridge"); and John Doe Corporations Nos. 1–10 ("Affiliated
Entities"). Granda alleges that defendants failed to pay him overtime wages in violation of the
Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* Granda also brings several claims
under state law: failure to pay overtime wages in violation of Article 19 of New York Labor Law
("NYLL") §§ 650, *et seq.*, and related regulations; failure to pay or delay in paying wages in
violation of NYLL §191; breach of contract; unjust enrichment; wage notice violations under
NYLL §§ 195 and 198; and wage statement violations under NYLL §§ 195 and 198. In addition,
he claims that Trujillo fraudulently conveyed funds to himself in violation of New York Debtor
& Creditor Law ("NYDCL") § 279.

Pending now is defendants' motion to dismiss Granda's Amended Complaint under
Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7). For the following reasons, the Court
grants in part and denies in part that motion.

1

## I.    Background

### A.    Facts[1]

From August 2015 until February 2018, Granda worked for Sailbridge, an investment management firm headquartered in New York. AC ¶ 38. Trujillo, an attorney licensed in New York, is Sailbridge's founder, CEO, and president. *Id.* ¶¶ 16–22. Jose Maria Barrionuevo, who is not a party to this action, was also a part owner of Sailbridge. *Id.* ¶ 41.

Before his employment at Sailbridge and until July 2015, Granda had been Managing Director at Blackspark Capital, LLC ("Blackspark"). *Id.* ¶ 25. Blackspark paid Granda $12,500 per month to perform financial modeling work for the company. *Id.* ¶ 26. During March 2015, Blackspark hired Trujillo as its General Counsel. *Id.* ¶ 29, Trujillo Aff. ¶ 10. Granda alleges that, in this role, Trujillo had authority to "direct the activities of all employees, including [Granda]." AC ¶ 30.

In July 2015, in the midst of financial turmoil at Blackspark, Granda claims that Trujillo requested a meeting with him at which Trujillo informed him that Blackspark's owners intended to fire all of the company's employees and that Trujillo wanted to continue doing business under

---

[1] The Court draws these facts principally from the Amended Complaint, Dkt. 21 ("AC"). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true, drawing all reasonable inferences in plaintiffs' favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Solely for purposes of the motion under Rules 12(b)(7), the Court considers facts outside the pleadings. *See Dumann Realty, LLC v. Faust*, 267 F.R.D. 101, 101 n.1 (S.D.N.Y. 2010) ("When reviewing a motion to dismiss under Rule 12(b)(7), the Court may consider documents and facts outside the pleadings."); *In re Rezulin Prods. Liability Litig.*, 133 F. Supp. 2d 272, 281 (S.D.N.Y. 2001) (considering affidavits filed by defendants in evaluating a Rule 21 motion). The Court draws these additional facts from the Affidavit of Juan Manuel Trujillo, Dkt. 23 ("Trujillo Aff."), and the Longobardi Declaration, Dkt. 24.

a different name. *Id.* ¶ 33. Trujillo, Granda alleges, asked him to join this new company—Sailbridge—and that Granda agreed to do so. *Id.* ¶ 34.

During his time at Sailbridge, Granda held the title of Managing Director. *Id.* ¶ 39. Granda claims that this position did not authorize him to hire and fire employees; instead, his principal responsibilities consisted of "performing financial modeling work and prepar[ing] presentations and other documents." *Id.* ¶ 40.

Granda alleges that Trujillo was his supervisor and, throughout Granda's employment, gave Granda directions on at least a weekly basis. *Id.* ¶ 41. These directions included, *inter alia,* contacting a Salvadoran oil company to get certain information, *id.* ¶ 42, providing financial models to employees in Sailbridge's Mexico City office, *id.* ¶ 43, and miscellaneous tasks such as performing research for White Papers, using his car to move furniture from Sailbridge's office to Trujillo's apartment, and looking up medical insurance providers for Sailbridge employees, *id.* ¶¶ 46–48. Granda alleges that Trujillo supervised his activities even when Barrionuevo, Trujillo's co-owner who frequently traveled for work, was in the New York office. *Id.* ¶ 41.

Granda claims that he often worked more than 40 hours in a given week. *Id.* ¶ 49. He specifically alleges that he worked between 65 and 70 hours during the Thanksgiving week in 2017. *Id.* ¶ 50. He claims that he was not compensated for any work, including during regular and overtime hours, he performed during that week. *Id.* ¶ 51. In addition, he claims that he never received any additional compensation for overtime hours worked at any point during his time at Sailbridge. *Id.* ¶ 52.

Granda alleges that under his employment agreement with Sailbridge, like his contract with Blackspark, his monthly salary was $12,500. *Id.* ¶ 54. He claims that he received a portion of his full salary only during some months and that he never received his full monthly salary at

any point. *Id.* ¶¶ 55–56.  He alleges that, between October 2016 and July 2017, Sailbridge did

not compensate him for any of the work he performed, despite Trujillo's alleged promises that

Granda would be paid when Sailbridge received the necessary funds. *Id.* ¶¶ 57–59.  Granda

further alleges that Barrionuevo requested that Trujillo pay Granda for the work he performed.

*Id.* ¶ 59.  He also claims that, in January 2018, Trujillo went from being one signatory to the

exclusive signatory on Sailbridge's bank accounts. *Id.* ¶¶ 53, 61.  In addition, he alleges that

Trujillo changed the mailing address for Sailbridge's bank account statements from the address

of its New York City office to that of Trujillo's Hamptons residence. *Id.* ¶ 61.

In September 2017, Granda alleges, Sailbridge received approximately $500,000 in

funds. *Id.* ¶ 62.  Trujillo, who Granda claims was in exclusive control of these funds, allegedly

used those funds to pay Sailbridge workers in Mexico City and conveyed at least a portion of

those funds to himself and to a company controlled by him known as "M&M Financial." *Id.*

¶¶ 63–68.  Granda claims that these conveyances were made without fair consideration. *Id.*

¶¶ 67, 69.

In September 2017, Granda claims, Trujillo offered to pay him via personal check, but

Granda refused and requested to be paid by company check. *Id.* ¶¶ 70–71.  In mid-September

2017, Granda allegedly received a $12,000 check from Sailbridge signed by Trujillo, paying him

a sum well below the amount he was then owed for the months during which he had not received

full pay. *Id.* ¶ 72.  In both September and October 2017, Trujillo allegedly received checks

paying him $6,000 of his $12,500 salary. *Id.* ¶¶ 74, 76.  These checks, Granda claims, bore

Trujillo's signature. *Id.* ¶¶ 73, 75.  Granda claims that he did not receive any additional

compensation after the October 2017 check. *Id.* ¶ 82.

In October 2017, Sailbridge moved offices. *Id.* ¶ 78.  Granda alleges that Trujillo

directed him, and Granda agreed, to transport expensive furniture from Sailbridge's office to Trujillo's apartment. *Id.* ¶ 79–80. Granda claims that he was not aware of any payment made by Trujillo to Sailbridge in consideration for the property he moved into Trujillo's home. *Id.* ¶ 81. In addition, Granda claims that the moving company damaged certain property owned by Sailbridge during the move, and that on January 22, 2018, Trujillo directed Granda to instruct the moving company to pay the insurance claim proceeds arising out of that property damage to Trujillo. *Id.* ¶¶ 82–83.

On February 6, 2018, Granda claims that Barrionuevo resigned from Sailbridge. *Id.* ¶ 88. Also in February 2018, Trujillo allegedly asked Granda to accompany him on a business trip to Africa. *Id.* ¶ 89. Granda claims that he rejected the request and reiterated his request to be paid, to which Trujillo allegedly did not respond. *Id.* ¶ 90.

### B.   Procedural History

On May 3, 2018, Granda filed an initial complaint. *See* Dkt. 5. On June 28, 2018, defendants moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and failure to join necessary parties pursuant to Rule 12(b)(7). *See* Dkt. 14.

On June 28, 2018, defendants filed a letter motion requesting that the Court stay discovery pending the resolution of its motion to dismiss. *See* Dkt. 19. On June 29, 2018, the Court granted that motion, directed Granda to file any amended complaint by July 27, 2018, and set a briefing schedule in the event that defendants filed a new motion to dismiss. *See* Dkt. 20.

On July 27, 2018, Granda filed this Amended Complaint. *See* Dkt. 21. On August 17, 2018, defendants filed a motion to dismiss the AC, *see* Dkt. 22, as well as a supporting memorandum of law, *see* Dkt. 25 ("Def. Mem."), an affidavit by Trujillo, *see* Dkt. 23 ("Trujillo

Aff."), and a declaration by defendants' counsel, Laura Longobardi, Esq., *see* Dkt. 24 ("Longobardi Decl.").

On August 31, 2018, Granda filed a memorandum of law in opposition to the motion to dismiss. *See* Dkt. 26 ("Pl. Mem."). On September 7, 2018, defendants filed a reply. *See* Dkt. 27 ("Def. Reply").

## II.    Motion to Dismiss for Failure to State a Claim

### A.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B.    Discussion

Defendants make various arguments under Rule 12(b)(6). First, defendants argue that Trujillo was not an "employer" of Granda as that term is defined by the FLSA and NYLL.[2] Def.

---

[2] Defendants do not contend that Sailbridge and the Affiliated Entities were not employers of Granda. Accordingly, for purposes of resolving this motion to dismiss, the Court confines its discussion to whether Trujillo was Granda's employer.

Mem. at 12.  Second, they contend that the AC fails to plead sufficient facts to support his

unpaid overtime claims and that the allegations in the AC demonstrate that Granda was exempt

from the FLSA and NYLL's overtime requirements.  *Id.* at 9, 16.  Third, they contend that the

AC does not plead sufficient facts to support its constructive and actual fraudulent conveyance

claims.  *Id.* at 21.  Fourth, they argue that if the AC is held not to state an FLSA claim, the Court

should decline to exercise supplemental jurisdiction over its state law claims.  *Id.* at 22.  The

Court addresses these issues in turn.

### 1.        Whether Trujillo is Granda's Employer

The FLSA defines "employer" as "any person acting directly or indirectly in the interest

of an employer in relation to an employee."  29 U.S.C. § 203(d).  This is an expansive definition

with "striking breadth."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  The

Second Circuit has held that "the determination of whether an employer-employee relationship

exists for purposes of the FLSA should be grounded in 'economic reality rather than technical

concepts,' determined by reference not to 'isolated factors, but rather upon the circumstances of

the whole activity.'"  *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir.

2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961); *Rutherford

Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  In addition, "[a]n individual may

simultaneously have multiple 'employers' for the purposes of the FLSA, in which case, 'all joint

employers are responsible, both individually and jointly, for compliance with all the applicable

provisions of the [FLSA].'"  *Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 204–05

(S.D.N.Y. 2014) (citing 29 C.F.R. § 791.2(a)).

In assessing economic reality, the Second Circuit has identified several sets of factors

relevant to this inquiry.  In its narrowest form, this analysis evaluates whether an alleged

employer exercised formal control, and at its broadest it evaluates functional control. Accordingly, "the exercise of formal control over employees is sufficient, but not necessary, to adequately allege an employer relationship." *Xiaoyan Liu v. Canteen 82 Inc.*, No. 17 Civ. 7862 (KPF), 2018 WL 6067228, at *5 (S.D.N.Y. Nov. 20, 2018) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).

When evaluating formal control, courts consider: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12 (quoting *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)). "Formal control does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 939 (S.D.N.Y. 2013) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (internal quotation marks omitted)).

When evaluating functional control, courts evaluate myriad relevant factors, depending on the circumstances of the case. For example, *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) identifies whether "the workers depend upon someone else's business . . . or are in business themselves." *Id.* at 1059. In addition, in *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003), the Second Circuit identifies the following, non-exclusive, factors:

> (1) whether [the alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which [the alleged employers] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the alleged employers].

8

*Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71–72 (2d Cir. 2003). The Second Circuit has clarified that the *Brock* factors are most relevant for "distinguishing between independent contractors and employees" and that the *Zheng* factors are most relevant in the context of subcontractor relationships, in determining whether an alleged employer exerts sufficient control over such workers to support a finding of employer status under the FLSA. *See Greenawalt v. AT&T Mobility LLC*, 642 Fed. App'x 36, 37 (2d Cir. 2016).

As to the NYLL, its definition of "employer" is nearly identical to that of the FLSA. *Compare* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."), *with* N.Y. Lab. Law § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."). Accordingly, "[c]ourts regularly apply the same tests to determine whether entities are joint employers for purposes of the FLSA and NYLL." *Ocampo v. 455 Hosp. LLC*, No. 14 Civ. 9614 (KMK), 2016 WL 4926204, at *5 n.7 (S.D.N.Y. Sept. 15, 2016); *see also Olvera*, 73 F. Supp. 3d at 206 (S.D.N.Y. 2014) ("The statutory standard for employer status under NYLL is nearly identical to that of the FLSA.").

Here, Granda's AC marshals considerable factual allegations that, taken as true, would establish that Trujillo was his employer under the *Carter* test of formal control. Its allegations support at least three of the four *Carter* factors.

First, the AC alleges that Trujillo specifically asked Granda to work for the new company and stated that he would not be hiring other Blackspark employees to work for his new enterprise, Sailbridge. *See* AC ¶¶ 33–34. In addition, the AC alleges that Trujillo "installed his former secretary . . . as office manager at Sailbridge." *Id.* ¶ 36. That Trujillo hired Sailbridge's

9

office manager is a strong indication that he was Granda's employer. *Cf. Herman*, 172 F.3d at 140 (applying economic reality test and finding that hiring managerial staff who supervised other employees was "a strong indication of control"). Granted, the AC does not allege that Trujillo's signature appears on his employment contract, nor does it claim that Trujillo ultimately fired Granda. But Granda's allegations do suggest that Trujillo had the power to hire and fire him: Trujillo offered him a job, just as he had offered jobs to other Blackspark employees, and Granda accepted that offer. The Court therefore finds that the first *Carter* factor favors Granda.

Second, the AC alleges that Trujillo directed Granda to perform various tasks on numerous occasions, including sending certain requested information to a client on July 16, 2015; sending financial models to a co-worker in Mexico City on October 19, 2016; and preparing a draft presentation for a prospective Mexican client on April 10, 2016. *See* AC ¶¶ 43–45. The AC buttresses these specific instances with general allegations of the types of projects Trujillo directed him to perform throughout his employment. *See id.* ¶¶ 42, 46–47. These allegations suggest that Trujillo did supervise and control Granda's work. The second *Carter* factor thus also favors finding employer status.

Third, the AC alleges that Trujillo controlled the timing, method, and amount of Granda pay. A key question in determining whether the AC meets the third *Carter* factor is whether Trujillo "had the authority to sign paychecks throughout the relevant period." *Herman*, 172 F.3d at 140; *see also Magnuson v. Newman*, 10 Civ. 6211 (JMF), 2013 WL 5380387, at \*9 (S.D.N.Y. Sept. 25, 2013) (allegation that defendant "signed Plaintiffs' paychecks . . . supports [] finding in favor of Plaintiffs on the third *Carter* factor"). Not only did Trujillo sign Granda's checks, according to the AC, he also decided when Granda would be paid. *See* AC ¶¶ 53, 58–59, 72–77, 87. Moreover, the AC claims that Granda's paychecks were irregular and never in the amount of

his full monthly salary. *See id.* ¶¶ 54–55. It further alleges that Trujillo became the sole

signatory of Sailbridge's bank accounts in January 2018. *See id.* ¶ 60; *see also Ethelberth v.*

*Choice Sec. Co.*, 91 F. Supp. 3d 339, 353 (E.D.N.Y. 2015) (having access to company's bank

account held sufficient to demonstrate individual's control over company's financial affairs). In

addition, the AC alleges that Trujillo even offered to pay him with a personal check to avoid

having a record of Granda's employment with Sailbridge. *See id.* ¶ 70. The third *Carter* factor,

therefore, like the first and second, clearly supports Granda's claims.

    As to the fourth *Carter* factor—*i.e.*, whether Trujillo maintained business records—the

Court finds that factor neutral here. Granda alleges that Trujillo changed the mailing address for

Sailbridge's bank account statements from its New York City office to that of Trujillo's

Hampton's residence. *Id.* ¶ 61. The AC, however, does not make any specific allegations that

Trujillo maintained employment records or that he hired an outside company to do so. *Cf.*

*Magnuson*, 2013 WL 5380387, at *9 (finding the fourth *Carter* factor met where alleged

employer, despite not being "personally and directly involved in maintaining employment

records," hired a payroll services company to do so). Nonetheless, the facts in support of the

other *Carter* factors unequivocally establish that Trujillo exercised sufficient control over

Granda's work that he may be held liable as an employer under the FLSA and NYLL.

    Defendants offer several competing interpretations of the facts alleged by Granda, but

none defeats a finding of employer status on the pleadings. Defendants argue that the first

example offered by Granda—the July 16, 2015 request to obtain information from a client—

actually occurred while Granda was allegedly employed by Blackspark and therefore cannot

establish that Trujillo was Granda's employer during the period for which he claims to have

worked at Sailbridge. Def. Mem. at 13–14. But the AC alleges that his employment began in

"approximately August 2015," which could have extended back to July of 2015. AC ¶ 37. But even if defendants are correct on this point, the AC alleges a bevy of facts that clearly show that Trujillo controlled the nature and terms of Granda's employment. Defendants brush these off as "at best show[ing] discrete instances over a nearly twenty-two month period in which Mr. Trujillo informally requested that Plaintiff perform his duties." *Id.* at 14. But the fact "[t]hat an employer does not exercise control continuously or consistently 'does not diminish the significance of its existence.'" *Hart*, 967 F. Supp. 2d at 912 (quoting *Irizarry v. Catsimatidis*, 722 F.3d 99, 110 (2d Cir. 2013)).

Next, defendants argue that even if Trujillo's status as part owner *may* vest him with the kind of authority typically wielded by an employer, that status alone does not establish such control. Defendants are certainly correct that "[e]vidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status." *Irizarry*, 722 F.3d at 109. But that is beside the point here, insofar as the AC contains numerous other factual allegations that support the conclusion that Trujillo was his employer.

Finally, defendants contend that because the AC alleges that Granda refused to perform certain tasks, Trujillo did not exercise sufficient control over him to be his employer. This argument would have more traction if the AC contained substantial factual allegations to the effect that Granda had refused to comply with instructions given by Trujillo. *See, e.g., Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508 (S.D.N.Y. 2013) (finding that room attendants' ability to refuse the directions given by housekeeping managers pointed to the managers' limited supervisory authority over the attendants). But the AC does not allege that. It alleges less: that in response to Trujillo's request that Granda accompany him on a trip to Africa, Granda claimed

to have been unable to do so. *See* AC ¶ 87. The AC suggests that Trujillo was making a request and not giving a command. And at other points, the AC alleges that Trujillo "instructed," "directed," and "ordered" him to perform various tasks. *See, e.g., id.* ¶¶ 43–45, 47. The AC does not allege any other occasion on which Granda refused to comply with Trujillo's instructions.

The AC thus plausibly pleads Trujillo's status as Granda's employer under the formal control test. Because the functional test set out in *Zheng* focuses on distinguishing between subcontractors and employees, a context not at issue here, the Court need not conduct that analysis. The Court accordingly holds that the AC adequately pleads that Granda is Trujillo's employer for purposes of triggering the FLSA's requirements. *See Greenawalt*, 642 Fed. App'x at 37 ("Because *Carter* defines employment more narrowly than the FLSA requires, satisfying this test is sufficient" to establish defendant as plaintiff's employer.).

### 2.    Failure to Pay Overtime

The Court turns next to defendants' challenge to Granda's claims of failure to pay as required for overtime work.

The FLSA requires that an employer pay its employees for all hours worked in excess of 40 hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The NYLL imposes the same requirements.[3] *See* N.Y. Lab. Law § 663; *see also Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3D 106, 118 (2d Cir. 2013) (agreeing that "the same standard applie[s] to FLSA and NYLL claims"). A plausible FLSA overtime claim "must provide sufficient detail about the length and frequency of [an

---

[3] Although the Court refers in the ensuing analysis solely to the FLSA, the analysis applies equally to the NYLL claims.

employee's] unpaid work to support a reasonable inference that [he] worked more than forty hours in a given week." *Nakahata v. N.Y.-Presbyterian Healthcare Sys.*, 723 F.3d 192, 201 (2d Cir.2013); *see also Lundy,* 711 F.3d at 114 ("[A] plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours.").

Salient here, the FLSA exempts, in pertinent part, employees who are employed in "a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). "To qualify for this exemption an employee's work must satisfy both a duties requirement and a salary requirement." *Anani v. CVS RX Servs., Inc.*, 730 F.3d 146, 147 (2d Cir. 2013). To determine whether an employee qualifies for this exemption, courts look to the employee's salary and his duties. *Anani*, 730 F.3d at 147 (exempt "employee's work must satisfy both a duties requirement and a salary requirement") (citations omitted). The regulations state that an administrative employee is one who (1) is "[c]ompensated on a salary basis" at a rate that is greater than $455 per week, (2) primarily performs "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) primarily performs tasks that require the "exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §§ 541.200(a)(1)–(3). They define "salary basis" as payment, "on a weekly[] or less frequent basis," of "a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602. "Whether an employer did or did not intend to pay employees on a salary basis is evidenced by a number of factors, including, significantly, the number and duration of the employer's lapses." *Thomas v. Bed Bath and Beyond, Inc.*, 309 F. Supp. 3d 121, 136 (S.D.N.Y. 2018) (citing 29 C.F.R. § 541.603(a)).

The FLSA also exempts "highly compensated employees" on the basis that a "high level
of compensation is a strong indicator of an employee's exempt status." *Id.* § 541.601(a), (c).
The regulations provide that "such an employee must receive total annual compensation of at
least $134,004." *Id.* § 541.601(b). Employees subject to this exemption must be paid on a salary
basis. *Id.* § 541.601(b)(1).

On a motion to dismiss, a defendant bears the burden of establishing that, on the face of
the complaint, the plaintiff was an exempt employee. *Chen v. Major League Baseball*, 6 F.
Supp. 3d 449, 454 (S.D.N.Y. 2014).

Here, the AC alleges that Granda "often worked more than 40 hours per week," but was
never given additional compensation for those overtime hours. AC ¶¶ 49, 52. Defendants argue,
under *Lundy*, that Granda's FLSA claim must be dismissed because he failed to plead with
adequate specificity that he worked more than 40 hours in any workweek. Alternatively, they
argue, Granda was an exempt employee and hence not entitled to overtime compensation.

Defendants' first argument is utterly without merit. Defendants cite *Lundy* for its holding
that a plausible FLSA claim requires plaintiff to allege at least "a single workweek in which [he]
worked at least 40 hours and also worked uncompensated time in excess of 40 hours." Def.
Mem. at 11–12. Granda's AC clearly does so here. *See* AC ¶¶ 50–51. It alleges, as a specific
example, that during the week of Thanksgiving 2017, he worked "at least 65–70 hour[s]" and
was not paid for his overtime work. *Id.* ¶¶ 50–51. Defendants argue that the AC's pleading as to
this week is inadequate because it does not state when that workweek began and ended. *See* Def.
Reply at 2–3. Defendants rely on *DeJesus v. HF Management Services*, 726 F.3d 85 (2d Cir.
2013), which held that a plaintiff must supply sufficiently developed factual allegations,
including by drawing on his "memory and experiences," in support of an overtime claim. *See*

Def. Reply at 3 (citing *DeJesus*, 726 F.3d at 90). But *DeJesus* is readily distinguished. The complaint there failed because it merely "tracked the statutory language of the FLSA, lifting its numbers and rehashing its formulation, but alleging no particular facts sufficient to raise a plausible inference of an FLSA overtime violation." *DeJesus*, 726 F.3d at 89. Here, in contrast, Granda's AC makes much more fulsome allegations, including alleging his approximate hours (65–70) during Thanksgiving week 2017. Defendants' counter that the "week of Thanksgiving 2017" could conceivably have spanned two of Granda's regular workweeks is similarly unpersuasive. On a motion to dismiss, the Court must accept all properly pleaded factual allegations as true. *See Koch*, 699 F.3d at 145. The AC, which uses the locution of the "*week of Thanksgiving 2017*," fairly isolates this as a singular workweek. Defendants are at liberty, of course, to test in discovery whether, as they imply, Granda's hours that week in fact spanned two workweeks and exceeded 40 hours in neither.

Defendants, as noted, separately argue that, on the pleadings, Granda necessarily was statutorily exempt from overtime pay. Defendants argue that Granda fits both the administrative and highly compensated employee exemptions. *See* Def. Mem. at 16. As to the administrative employee exemption, defendants argue that Granda's base annual salary of $150,000 qualifies for the exemption, insofar as that salary corresponds to base weekly pay above the $455 required by 29 C.F.R. § 541.601(b)(1). *See id.* at 17. They also argue that the tasks that Granda alleges Trujillo instructed him to perform—e.g., financial modeling work and searching for medical records—and his "Managing Director" title connote an exempt employee. *See id.* at 17–18. As to the highly compensated employee exemption, defendants note that Granda's annual salary of $150,000 exceeds the $134,004 minimum annual salary specified in the regulations governing this exemption. *See id.* at 17.

Neither argument is availing at this stage.  The AC adequately alleges both that Granda was not in fact a salaried employee and that the salary he received did not meet the required minimum amount.  It claims that, in fact, Granda was not regularly paid at all, and indeed that he went months at a time without receiving a paycheck.  *See* AC ¶¶ 55, 57.  It further alleges that Granda and even Sailbridge's co-owner Barrionuevo had to plead with Trujillo for Granda to be paid and that none of the checks he occasionally received ever matched his ostensible salary.  *See* AC ¶¶ 54, 59.  Effectively, Granda alleges that, in practice, he was paid at the whim of Trujillo. These allegations, taken as true, are sufficient to conclude that Granda fell outside both exemptions.  The AC's allegations further undermine defendants' arguments insofar as they plead that, whatever Granda's scheduled salary may have been, he was actually paid far below the minimum sum required to trigger the highly compensated employee exemption.

Accordingly, the Court denies defendants' motion to dismiss Granda's overtime claims. The AC plausibly pleads that he worked in excess of 40 hours during at least one workweek and he does not fall under a statutory exemption.

### 3.    Fraudulent Conveyance Claims

The Court turns now to Granda's claims under the NYDCL.

#### a.    *Constructive Fraudulent Conveyance*

As the Second Circuit has explained, the NYDCL deems a conveyance constructively fraudulent "if it is made without 'fair consideration,' and (*inter alia*) if one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, *id.* § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, *id.* § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, *id.* § 275." *In re Sharp Int'l*

17

*Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).  Fair consideration requires that "(1) . . . the recipient of the debtor's property[] must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a 'fair equivalent' of the property received; and (3) such exchange must be in 'good faith.'"  *Id.* (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058–59 (2d Cir. 1995) (alteration in original) (emphasis removed).

The AC does not plead facts with sufficient particularity to state a claim for constructive fraudulent conveyance under the NYDCL.  It makes a slew of allegations "on information and belief."  For example, it claims that "Sailbridge is now defunct," AC ¶ 91, and that in the year before the company's insolvency, Trujillo, Sailbridge's co-owner, engaged in a series of conveyances of property, *see, e.g., id.* ¶¶ 66, 68.  Although "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief," allegations made on that basis must be "peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations and internal quotation marks omitted).  The AC does not provide any factual allegations to suggest that this information is peculiarly within defendants' possession.  Nor does it allege other facts to make plausible the inference of unspecified conveyances from Sailbridge to Trujillo. The Court therefore considers only the allegations of conveyances made on the basis of Granda's direct knowledge.

Granda makes one such factual allegation with sufficient particularity: that Trujillo directed him to deliver Sailbridge's furniture and other tangible property from the corporate headquarters to Trujillo's house.  *See* AC ¶ 82.  To state a claim under the NYDCL for constructive fraudulent conveyance, however, Granda must also allege that the conveyance was

made without fair consideration. Here, too, Granda relies on the conclusory claim, based "on

information and belief," that the conveyance lacked fair consideration. *Id.* ¶ 81. Defendants

persuasively argue that to satisfy the plausibility requirement, this allegation must be buttressed

by some factual allegations to this effect, e.g., that Trujillo "did not convey property or discharge

an antecedent debt in a good faith exchange of equivalent value." Def. Reply at 9. The AC does

not so allege. The Court therefore holds that the AC fails to state a constructive fraudulent

conveyance claim against Trujillo under the NYDCL.

b.  *Actual Fraudulent Conveyance*

The NYDCL also prohibits actual fraudulent conveyances. A conveyance is an actual

fraudulent conveyance if made "with actual intent . . . to hinder, delay, or defraud either present

or future creditors." N.Y. Debt. and Cred. Law § 276. "Where actual intent to defraud creditors

is proven, the conveyance will be set aside regardless of the adequacy of consideration given."

*In re Sharp*, 403 F.3d at 56 (citation omitted).

A claim of actual fraudulent conveyance must satisfy the heightened pleading standards

of Federal Rule of Civil Procedure 9(b). *Id.* Rule 9(b) requires a plaintiff to "(1) detail the

events giving rise to the fraud, such as the statement/omission that is alleged to be fraudulent, the

identity of the speaker, the location of the fraud, and the reason the statement is fraudulent and

(2) allege facts 'that give rise to a strong inference of fraudulent intent.'" *Knopf v. Meister,*

*Seelig & Fein, LLP*, No. 15 Civ. 5090 (DLC), 2016 WL 1166368, at *6 (S.D.N.Y. Mar. 22,

2016), *aff'd*, 721 F. App'x 96 (2d Cir. 2018) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells*

*Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir.2015)). "Due to the difficulty of proving actual

intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to

support his case, i.e., circumstances so commonly associated with fraudulent transfers that their

19

presence gives rise to an inference of intent." *In re Sharp*, 403 F.3d at 56 (citations omitted).

"Badges of fraud" include, *inter alia*: (1) "a close relationship between the parties to the alleged

fraudulent transaction," (2) "a questionable transfer not in the usual course of business,"

(3) "inadequacy of the consideration," (4) "retention of control of the property by the transferor

after the conveyance," and (5) "secrecy, haste, or unusualness of the transaction." *Id.*

Unsurprisingly, insofar as the AC's allegations fail to satisfy the more lenient pleading

standards governing its constructive fraudulent conveyance claims, these allegations also fail to

state a claim of actual fraudulent conveyance. Although a plaintiff may rely on "badges of

fraud" to support his claim of actual fraudulent conveyance, the allegations in the AC are too

threadbare to be viewed as even signals of fraud. For example, the AC alleges that "in October

or November 2017, Trujillo conveyed funds from Sailbridge to a company controlled by Trujillo

known as 'M&M Financial.'" AC ¶ 68. Although the Court can imagine scenarios and business

arrangements that might render such a conveyance fraudulent, these bare facts pled do not

inherently make such a conveyance suspect. The AC does not make any allegations about M&M

Financial other than that Trujillo controlled it and that Sailbridge conveyed funds to it. These

factual allegations do not satisfy the heightened pleading standard under Rule 9(b) governing

claims of actual fraud. The Court therefore grants defendants' motion to dismiss the AC's actual

fraudulent conveyance claim.

### 4.   Supplemental Jurisdiction

The Court considers next defendants' argument that it should decline to exercise

supplemental jurisdiction over Granda's state-law claims.

Federal district courts have supplemental jurisdiction over state-law claims "that are so

related to claims in the action within such original jurisdiction that they form part of the same

case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

Such jurisdiction, however, is discretionary. *See City of Chicago v. Int'l Coll. of Surgeons*, 522

U.S. 156, 173 (1997). A district court "may decline to exercise supplemental jurisdiction" if it

"has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

When deciding whether to exercise its supplemental jurisdiction, a district court should

balance the traditional "values of judicial economy, convenience, fairness, and

comity." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Purgess v.*

*Sharrock*, 33 F.3d 134, 138 (2d Cir.1994) ("[T]he discretion implicit in the word 'may'

in subdivision (c) of § 1367 permits the district court to weigh and balance several factors,

including considerations of judicial economy, convenience, and fairness to litigants."). Both the

Second Circuit and the Supreme Court have held, however, that, as a general rule, "when the

federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch*

*Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383

U.S. 715, 726 (1966)). Where federal claims have been dismissed, in the ordinary case, such a

dismissal "will point toward declining jurisdiction over the remaining state-law claims." *In re*

*Merrill Lynch*, 154 F.3d at 61 (citing *Cohill,* 484 U.S. at 350 n.7); *see also Obot v. Bailey*, 557

Fed. App'x 96 (2d Cir. 2014) (summary order) ("In the usual case in which all federal-law

claims are eliminated before trial, the balance of factors will point toward declining to

exercise jurisdiction over the remaining state-law claims.").

Here, however, the Court has held that Granda has plausibly pleaded sufficient facts to

sustain his overtime claims under the FLSA. There is no serious argument why the Court should

decline to exercise supplemental jurisdiction over Granda's remaining state law claims. These

claims are related to—indeed, the NYLL claims largely track—Granda's NYLL claims. *See,*

*e.g., Lundy* 711 F.3D at 118 (NYLL and FLSA apply same standard to unpaid overtime claims). If anything, the Court's dismissal of Granda's NYDCL claims, which implicate a body of law distinct from Granda's other claims (federal and state), heightens the overlap between Granda's surviving federal and state claims.  The Court will therefore exercise supplemental jurisdiction over Granda's state-law claims.

### III.     Motion to Dismiss for Failure to Name Necessary Parties

#### A.     Applicable Legal Standards

A party may seek dismissal under Rule 12(b)(7) for failure to join a necessary party under Rule 19.  Rule 12(b)(7) requires a district court to "dismiss an action where a party was not joined only if: (1) an absent party is required, (2) it is not feasible to join the absent party, and (3) it is determined 'in equity and good conscience' that the action should not proceed among the existing parties."  *In re Great Atl. & Pac. Tea Co., Inc.*, 467 B.R. 44, 58 n.9 (S.D.N.Y. 2012), *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co.*, 508 F. App'x 63 (2d Cir. 2013) (quoting *Republic of Phil. v. Pimentel*, 553 U.S. 851, 862–63 (2008)).

A person must be joined as a necessary party, if feasible, if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).  The second prong of Rule 19(a) requires that "there must be more than an unsupported assertion that [the non-joined party] has a claim to that interest."  *Jonesfilm v. Lion Gate Int'l*, 299 F.3d 134, 140 (2d Cir. 2002)).

"Where a court makes a threshold determination that a party is necessary under Rule 19(a) and joinder of the absent party is not feasible for jurisdictional or other reasons, the court

must then determine whether the party is 'indispensable' under Rule 19(b)." *Dunn v. Standard Bank London Ltd.*, No. 05 Civ. 2749 (DLC), 2006 WL 217799, at *2 (S.D.N.Y. Jan. 30, 2006) (citing *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002)). Rule 19(b) provides that "[t]he court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed. R. Civ. P. 19(b). Rule 19(b) sets forth "factors to be considered by the court" in determining whether an absent party is indispensable. These include:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.*

### B.    Discussion

In their motion to dismiss under Rule 12(b)(7), defendants challenge Granda's failure to join Barrionuevo, Sailbridge's former co-owner, and Blackspark, Granda's former employer. Defendants make three arguments why Barrionuevo and Blackspark are necessary parties. The Court summarizes and addresses each in turn.

First, defendants argue that the Court cannot afford complete relief in the absence of these parties. Def. Mem. at 19. As to Blackspark, defendants appear to argue that—while the AC does not expressly so allege—Sailbridge assumed Granda's contract with Blackspark, and thus an adjudication of what those terms were is necessary to determine what Sailbridge's contractual obligations were to Granda. *See id.* at 19–20. As to Barrionuevo, defendants argue that his discussions with Granda are central to understanding the terms of his employment arrangement with Sailbridge. *See id.*

23

These arguments are meritless.  The business records of Blackspark (like those of Sailbridge) may prove germane to Granda's claims.  And Barrionuevo's testimony, too, may prove relevant.  But that does not require that these entities be made parties.  Defendants do not offer any coherent reasons why Blackspark's records cannot be reached (e.g., by a third-party subpoena) if it is a non-party or why Barrionuevo will be unavailable to be deposed unless he is made a party.

Second, defendants argue that Blackspark and Barrionuevo have an interest in being parties to this lawsuit, to enable them to defend themselves against a future claim the current defendants may make to the effect that they are jointly liable for any claims by Granda held meritorious.  *See id.* at 20.  This argument is unpersuasive.  As to Blackspark, Granda's unpaid wages and overtime claims, as pled, cover only the period for which he worked for Sailbridge. Defendants have not articulated a plausible theory under which Granda could bring a claim, as to the period of his Sailbridge employment, against Blackspark.  As to Barrionuevo, as co-owner of Sailbridge, depending on the facts, Barrionuevo conceivably could have qualified as an employer of Granda so as to be liable under the FLSA or NYLL for any wage claims.  But the AC does not plead facts that suggest that Barrionuevo asserted sufficient control over Granda to sustain such a finding.  On the contrary, the AC, which pleads ample facts as to Trujillo's control, supports the opposite inference:  It alleges that Barrionuevo often traveled for work and Trujillo supervised Granda, even when Barrionuevo was present in the office.  *See* AC ¶ 41.  Moreover, even if Barrionuevo were a joint employer, with defendants, of Granda, dismissal of Granda's claims would not be required because such an employer along with any co-employer would be "jointly and severally liable under the FLSA for unpaid wages."  *Moon v. Kwon*, 248 F. Supp. 2d 201, 237 (S.D.N.Y. 2002).  Finally, to the extent that defendants may envision an argument not

24

suggested by the pleadings under which their liability to Granda was in fact the shared responsibility of others, defendants are at liberty to implead such other parties. Granda, however, was under no obligation to add other defendants to this lawsuit.

Third, defendants argue that failing to join Blackspark and Barrionuevo might impair defendants' ability to seek contribution or indemnity from Blackspark or Barrionuevo. *See id.* at 21. This threadbare argument is unpersuasive. Defendants do not articulate the legal or factual bases on which they would propose to seek such relief from either non-party. Defendants' blurry suggestion that "[t]here may also be other, unknown contingencies arising from the absence of Blackspark and/or Barrionuevo from this action" is insufficient to justify dismissal of Granda's claims on the ground that the absence of these two as defendants poses a genuine possibility of harm to the existing defendants. Def. Mem. at 21.

Accordingly, the Court holds that neither Blackspark nor Barrionuevo is a necessary party to this action. Joinder of neither is mandatory under Rule 19(a). The Court therefore denies defendants' motion to dismiss based on Rule 12(b)(7).

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss Granda's claims, except as to the claims under the NYDCL for constructive and actual fraudulent conveyance, which the Court dismisses. The Court respectfully directs the Clerk of Court to terminate the motion pending at Dkt. 22.

Discovery will now commence. By Tuesday, February 5, 2019, the parties are to submit a proposed case management plan, consistent with the Court's Individual Rules and Practices in Civil Cases, that provides for the close of fact discovery by the end of June 2019.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: January 30, 2019
       New York, New York